UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

          Plaintiff,

   v.

$16,037.00 UNITED STATES
CURRENCY,

          Defendant.

---

ROSALYN MCFADDEN, *as Administrator of the Estate of Nazier L. McFadden*,

          Claimant.

---

19-CV-1056-LJV-MJR
DECISION & ORDER

      On August 9, 2019, the United States commenced this action under 21 U.S.C. § 881(a)(6), alleging that the defendant $16,037.00 in United States currency ("defendant currency") was subject to civil forfeiture. Docket Item 1. On September 30, 2019, Nazier McFadden filed a claim for the defendant currency. Docket Item 7.

      On October 9, 2019, the case was referred to United States Magistrate Judge Michael J. Roemer for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 8. On October 21, 2019, McFadden moved to dismiss, Docket Item 11; on November 7, 2019, the United States amended the complaint, Docket Item 12; on December 12, 2019, McFadden filed a supplemental memorandum of law, Docket Item 15; and on January 3, 2020, the United States responded to that filing, Docket Item 17. On March 12, 2020, Judge Roemer issued a Report and Recommendation ("R&R")

finding that McFadden's motion to dismiss the complaint should be denied.  Docket Item 19.

On March 26, 2020, McFadden objected to the R&R on the grounds that Judge Roemer (1) applied the incorrect legal standard and (2) misapplied the governing standard to the facts alleged in the amended complaint.  Docket Item 20.  On April 9, 2020, the United States responded to those objections.  Docket Item 22.  McFadden did not reply, and the time to do so has expired.  *See* Docket Item 21.

The Court then heard oral argument from both sides on October 5, 2020.  *See* Docket Item 24.  After the Court learned that McFadden had passed away, the Court requested additional briefing on standing.  Docket Item 25.  McFadden submitted that briefing on October 19, 2020, Docket Item 26; the government responded on October 26, 2020, Docket Item 27; and McFadden replied on October 30, 2020, Docket Item 28.  On November 10, 2020, McFadden and the government submitted additional briefing on the issue of whether McFadden's estate needed to be substituted as the claimant.  Docket Items 30, 31.

Upon learning that the claimant's mother, Rosalyn McFadden, had petitioned to be named administrator of McFadden's estate, *see* Docket Item 30 at 2 n.1—and that, upon appointment, she would move for substitution—the Court stayed the case pending substitution, Docket Item 32.  Rosalyn McFadden then was named administrator, and on February 2, 2022, she moved under Rule 25(a)(1) of the Federal Rules of Civil

Procedure to substitute herself, as administrator of Nazier McFadden's estate, as the claimant in this case.[1]  Docket Item 37.  The Court granted that motion.  Docket Item 38.

On June 13, 2022, the Court held a status conference and confirmed with both sides that the case now is ripe for this Court to rule on McFadden's objections to the R&R.  Docket Item 42.  The Court therefore lifts the stay and addresses the pending objections to Judge Roemer's R&R on the motion to dismiss.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objection and the response; and the materials submitted to Judge Roemer.  Based on that *de novo* review and for the following reasons, the Court respectfully disagrees with Judge Roemer's recommendation and instead grants McFadden's motion to dismiss.

## **FACTUAL BACKGROUND**

The government alleges[2] that on March 13, 2019, nineteen-year-old Nazier McFadden attempted to fly from Buffalo, New York, to California.  *See* Docket Item 12

---

[1] Previously, on September 30, 2021, counsel for the decedent had moved to substitute Rosalyn McFadden, as administrator of Nazier McFadden's estate, as the claimant in the case pursuant to Rule 25(a)(1), Docket Item 35.  The Court denied that motion without prejudice because the motion had not been made by an attorney with the authority to represent the estate.  Docket Item 36.

[2] The Court assumes the reader's familiarity with the facts alleged in the amended complaint, *see* Docket Item 12, and Judge Roemer's analysis in the R&R, *see*

3

at 2-4.  According to McFadden, he intended to move to California with an aunt who lived in Baltimore and who was making the trip separately.  *Id.* at 3.  He said that he planned to stay with a friend in a rental unit until his aunt arrived.  *Id.* at 2-3.

But as McFadden passed through the security checkpoint at the Buffalo airport, agents of the Transportation Security Administration ("TSA") stopped him when they found that he had a large quantity of cash—later determined to be $16,037.00—stored in his carry-on bag.  *Id.*  Officers of the Niagara Frontier Transportation Authority ("NFTA") then transported McFadden off site for questioning.  *Id.* at 3.

During that interview, McFadden first said that he had earned the money working odd jobs over the past year.  *Id.* at 4.  He later changed his story to say that he had earned most of the money but that about $5,000 was a gift for his friend from that friend's girlfriend.  *Id.* at 5.  The NFTA officers seized the defendant currency but did not arrest McFadden.  *Id.*  No criminal charges were filed, and McFadden had no criminal record.  *Id.*  Tragically, McFadden was killed on August 13, 2020, in Rochester, New York.  Docket Item 26 at 2; Docket Item 26-3.

## LEGAL PRINCIPLES

### I.   CIVIL FORFEITURE

Under 21 U.S.C. § 881(a)(6),

The following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . All moneys, negotiable instruments,

---

Docket Item 19.  Whenever factual details are recited in this decision and order, the Court has "presume[d] all factual allegations in the complaint to be true and view[ed] them in a light most favorable to the plaintiff."  *See Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (citations omitted).

securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

*Id.* "[T]he burden of proof is on the [g]overnment to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). And where, as here, "the [g]overnment's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the [g]overnment shall establish that there was a substantial connection between the property and the offense." *Id.* § 983(c)(3).[3]

For suspected drug proceeds, that does not mean a link "between the property and any specific drug transaction," but it does mean that the government must demonstrate that "based on a totality of the circumstances, . . . the property [was] substantially connected to *narcotics trafficking*." *United States v. U.S. Currency in Sum*

---

[3] Before the enactment of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), "civil forfeiture proceedings were analyzed under a two-step burden-shifting framework." *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 195 (2d Cir. 2013).

Under the first step, the initial burden in judicial forfeiture proceedings was placed on the government to establish probable cause for forfeiture . . . . The government was *not* required, as part of its initial burden, to demonstrate a substantial connection between the drug activities and the property in question, but only a nexus between them. Once the government met its initial burden, the ultimate burden of proof then shifted to the claimant to show by a preponderance of the evidence that the property was not subject to forfeiture.

*Id.* (citations and internal quotation marks omitted). "Under CAFRA, the burden of proof now rests solely with the government to show by a preponderance of the evidence— rather than mere probable cause—that the property is subject to forfeiture. CAFRA also replaced the existing nexus standard with the more rigorous substantial connection test . . . ." *Id.* at 196 (citations and internal quotation marks omitted).

*of One Hundred Eighty-Five Thousand Dollars ($185,000)*, 455 F. Supp. 2d 145, 149

(E.D.N.Y. 2006) (emphasis added) (citing *United States v. Funds in Amount of Thirty*

*Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 467-70 (7th Cir. 2005))

(additional citation omitted).  In other words, the government must show a substantial

connection to *drug trafficking*; a connection to criminal activity generally is not enough.

*See United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039, 1044 (9th Cir. 1994).

## II.    MOTION TO DISMISS

To survive a motion to dismiss a complaint for civil forfeiture, the United States

must "state sufficiently detailed facts to support a *reasonable belief* that [it] will be able

to meet its burden of proof at trial."  Fed. R. Civ. P. Supp. R. G(2)(f) (emphasis added).[4]

Although the government need not detail "adequate evidence . . . to *establish* the

forfeitability of the property," 18 U.S.C. § 983(a)(3)(D) (emphasis added), it must allege

more than the notice ordinarily required in civil complaints.  Indeed, Rule G articulates

"a higher standard than 'notice pleading.'"  *See Aguilar*, 782 F.3d at 1109 (citing *United*

*States v. $191,910.00 in U.S. Currency,* 16 F.3d 1051, 1068 (9th Cir. 1994),

---

[4] Until December 1, 2006, civil forfeiture proceedings under 21 U.S.C. § 881 were governed by Supplemental Rule E, which required that a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  *See United States v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1215-16 (10th Cir. 1986) (quoting Fed. R. Civ. P. Supp. R. E(2)(A)).  "[T]he advisory committee's note [to the current rule, Rule G,] indicates that the language is designed to codify the 'standard' that 'has evolved' from case law interpreting its predecessor—Supplemental Rule E(2)(a)—and 'carr[y] this forfeiture case law forward without change.'"  *United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015) (quoting Rule G of Supplemental Rules, advisory committee's note on 2006 adoption (citing *United States v. Mondragon,* 313 F.3d 862 (4th Cir.2002))).

*superseded by CAFRA on other grounds*).[5]  That is so because of "[t]he drastic nature of . . . forfeiture remedies" and because, in order to "answer responsively or to investigate further an allegation that property was used in connection with criminal activity, a claimant must have a point from which to begin."  *See $39,000 in Canadian Currency*, 801 F.2d at 1221-22 (citation omitted); *see also United States v. 4492 South Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir.1989) (explaining that the "more stringent" pleading requirements in forfeiture actions is "a way of ensuring that the government does not seize and hold, for a substantial period of time, property to which, in reality, it has no legitimate claim" (quoting *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 638 (1st Cir. 1988))).

---

[5] *Compare* Fed. R. Civ. P. 8(a)(2) (requiring that a pleading contain "a *short and plain* statement of the claim showing that the pleader is entitled to relief" (emphasis added)) *and Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 560 (2007) (holding that a complaint meets Rule 8's "plausibility standard" "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely" (citation omitted)), *with* Fed. R. Civ. P. Supp. R. G(2)(f) (requiring that the complaint "state *sufficiently detailed facts* to support a *reasonable belief* that the government will be able to meet its burden of proof at trial" (emphasis added)).  *See also Mondragon,* 313 F.3d at 865 (discussing Rule E(2)'s "heightened particularity in pleading requirement" and collecting cases); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16-17 (D.D.C. 2008) ("Rule G (and its predecessor Rule E(2)) creates a heightened burden for pleading on the plaintiff." (citing *Mondragon,* 313 F.3d at 865; 12 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 3242 (2d ed. 1997))); *$39,000 in Canadian Currency*, 801 F.2d at 1216 ("Rule E(2)(a) requires a more particularized complaint than is necessary in civil actions generally or in those admiralty proceedings where drastic remedies, such as *in rem* forfeitures, are not sought." (citing 12 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 3242 (1973); 5 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1227 (1969))); *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 542 (S.D.N.Y. 2011) ("[Rule G(2)(f) is] more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure." (quoting *United States v. Daccarett,* 6 F.3d 37, 47 (2d Cir.1993), *superseded by CAFRA on other grounds*)).

The question therefore is whether the United States has pleaded facts supporting a "reasonable belief"—even if not "establish[ing]"—that the defendant currency was "more likely than not" the "proceeds" of, or intended payment for, a controlled substance transaction. *See In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 86 (2d Cir. 2016). It has not.

## DISCUSSION

### I. STANDING

As explained in this Court's April 2022 decision granting Rosalyn McFadden's motion to substitute, McFadden's death does not invalidate his claim. Docket Item 38 at 3. "Civil forfeiture proceedings do not abate after the death of the property owner." *United States v. 509 Raspberry Patch Drive*, 116 F. Supp. 3d 190, 192 n.2 (W.D.N.Y. 2015) (quoting *SEC v. Wyly*, 860 F. Supp. 2d 275, 281 (S.D.N.Y. 2012)); *see also United States v. Land, Winston Cnty.*, 221 F.3d 1194 (11th Cir. 2000) (explaining that claimant's death during appeal process did not abate her claim and reaching the merits of decedent-claimant's claim). The government does not contend that McFadden's death destroys standing but instead argues that McFadden never had a sufficient ownership interest in—and therefore standing to claim—the $5,037 that was a gift he was taking to a friend. Docket Item 27 at 7.

Claimants in a civil forfeiture action need both "standing under the statute or statutes governing their claims" ("statutory standing") and "standing under Article III of the Constitution" ("Article III standing"). *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999). The claimant bears the burden of proving standing. *Mercado v. U.S. Customs Serv.*, 873 F.2d 641, 644 (2d Cir. 1989).

8

"To demonstrate statutory standing, a civil forfeiture claimant must demonstrate compliance with the statutory requirements" of Rule G. *United States v. $541,395.06 U.S. Currency*, 2012 WL 3614294, at *3 (W.D.N.Y. Aug. 21, 2012). "Where a claimant fails to comply with the deadlines provided by [Rule G], his claim may be stricken for lack of statutory standing." *Id.* (citing *United States v. $27,601.00 U.S. Currency*, 800 F. Supp. 2d 465, 467 (W.D.N.Y. 2011); *Cambio Exacto S.A.*, 166 F.3d at 562).

To demonstrate Article III standing, "a [claimant] must allege a 'distinct and palpable injury to himself,' that is the direct result of the 'putatively illegal conduct of the [adverse party], and 'likely to be redressed by the requested relief.'" *Cambio Exacto S.A.*, 166 F.3d at 527 (quoting *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1157 (2d Cir. 1994)). "[A]n owner of property seized in a forfeiture action will normally have standing to challenge the forfeiture" because ownership is a "reliable indicator[]" of injury. *Id.*

A claimant is an owner when he has "'actual possession, dominion, control, title, or financial stake' in the specific forfeited property." *$541,395.06 U.S. Currency*, 2012 WL 3614294, at *2 (citation omitted). In addition, "[a]n allegation of ownership and *some evidence* of ownership are together sufficient" to confer Article III standing. *Cambio Exacto S.A.*, 166 F.3d at 527 (emphasis added) (citing *Torres*, 25 F.3d at 1158); *see also United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1113 (5th Cir. 1992) (claimant's statement he owned seized currency together with government's

admission claimant exercised dominion over currency at time of seizure sufficient to establish standing).[6]

The parties do not dispute that McFadden has satisfied the statutory and procedural requirements of Rule G. He therefore has statutory standing. And McFadden's statement that the $5,037 was a gift for a friend and would ultimately go to him does not destroy his ownership interest in that money. McFadden brought a claim for the entire $16,037 seized, Docket Item 7, and, as the government admits, he was in actual possession of the entire $16,037 at the time of seizure, Docket Item 12 at 1-3. That is sufficient for Article III standing. *See $38,570 U.S. Currency*, 950 F.2d at 1113.

## II.   CIVIL FORFEITURE

The government has not met its burden to "state sufficiently detailed facts [needed] to support a reasonable belief that [it] will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(f). The deficiency is not that the allegations fail to support a theory that the defendant currency was the proceeds of criminal activity. It is that they fail to support the theory advanced in the complaint: that the defendant currency was the proceeds of *narcotics trafficking*.

To be sure, McFadden's same-day purchase of a cross-country flight is suspiciously inconsistent with his claim that he intended to permanently move across the country. McFadden's lack of checked baggage adds to that inconsistency.

---

[6] To prove Article III standing, a claimant "need not prove the full merits of her underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court." *Torres*, 25 F.3d at 1158 (internal quotation marks omitted) (quoting *United States v. 116 Emerson St.*, 942 F.2d 74, 78 (1st Cir. 1991)).

Similarly, McFadden's claim that the defendant currency was earned from working for his uncle, and his later somewhat-changed explanation about its source, creates doubt about whether the funds were lawfully obtained.

But even if such suspicions and doubts support a reasonable inference of criminal activity, they do not support an inference of narcotics trafficking—that is, none of these allegations create a "reasonable belief" that the government will be able to show "a substantial connection between the property and the [alleged criminal] offense." *See* 18 U.S.C. § 983(c)(3). As the Ninth Circuit noted about a similarly situated claimant, "[McFadden] 'could just as easily have been a distributor of "street money" in a political campaign, an embezzler, a jewel smuggler, an art thief, or an S & L crook as a drug conspirator.'" *See U.S. Currency, $30,060.00*, 39 F.3d at 1044 (quoting *$191,910.00 in U.S. Currency*, 16 F.3d at 1072) (affirming summary judgment in claimant's favor). And "suspicions of general criminality are not enough." *$191,910.00 in U.S. Currency*, 16 F.3d at 1072 (affirming summary judgment in claimant's favor).

Once the allegations of criminality, generally, are separated from the allegations of drug trafficking, specifically, all that remains of the latter is that McFadden smelled of marijuana on the day in question; a drug-detection canine ("K-9") alerted that drugs were present on the defendant currency; and the defendant currency included a lot of bundled twenty-dollar bills. Considered together, even alongside the allegations of general criminal activity, those allegations still do not suffice.

That McFadden smelled of, and admitted to smoking, marijuana does little to help the government's case. A college-aged person smelling of marijuana may give rise to the inference that the person *uses* marijuana and that the person *purchases*

marijuana for personal use, but it does not give rise to the inference that the person *traffics* that substance or any other.  As the Fifth Circuit explained in reversing a district court's order directing forfeiture of $38,000 found alongside a pipe bearing marijuana residue and rolling papers, "[the paraphernalia], while relevant, is certainly not as compelling as the evidence presented in the many other reported cases which disclosed that the [claimants] had either admitted the money's intended purpose or could be linked to narcotics transactions by testimony of past drug-related activities, more incriminating drug paraphernalia, or the discovery of actual drugs."  *United States v. $38,600.00 in U.S. Currency*, 784 F.2d 694, 698 (5th Cir. 1986) (collecting cases). Indeed, the government's assertion here illogically implies that anyone who smokes marijuana could be made, at any time, to forfeit all the cash in his or her pockets.

The allegation regarding the K-9 alert fares no better.  The Ninth Circuit long has "questioned the probative value of positive dog alerts due to the contamination of America's paper money supply with narcotics residue."  *See U.S. Currency, $30,060.00*, 39 F.3d at 1042 (collecting cases); *see also $191,910.00 in U.S. Currency*, 16 F.3d at 1062 n.21 (same and collecting cases).  This Court shares that concern.  Indeed, in light of "[c]redible studies indicat[ing] that as much as 90% of the paper currency in the United States is contaminated with a 'detectable amount' of cocaine," *United States v. Chin Chong*, 990 F. Supp. 2d 320, 322 (E.D.N.Y. 2014) (collecting cases and studies), "the continued reliance of courts and law enforcement officers on [such alerts] to separate 'legitimate' currency from 'drug-connected' currency is logically indefensible," *U.S. Currency, $30,060.00*, 39 F.3d at 1043 (alteration in original) (quoting *Jones v.*

*Drug Enf't Admin.*, 819 F. Supp. 698, 721 (M.D. Tenn. 1993)).[7]  "Undoubtedly, [the]

positive dog alert [in this case] is probative in showing that the [defendant] currency

ha[d] been in contact with a narcotics substance or contaminated currency at some

'prior' point in time.  The mere fact of prior contamination does not establish,"—or even

support a reasonable belief—"however, that the [defendant] currency was actually

exchanged for or intended to be exchanged for drugs by [McFadden]."  *See id.* (citation

omitted).

That is especially the case here, where McFadden "had a strong odor of

marijuana on him" at the time of the seizure.  Docket Item 12 at 4.  Nothing in the

amended complaint suggests that the K-9, which was trained to alert to "marijuana,

cocaine, heroin, ecstasy, methamphetamine[,] and their derivatives," alerted to anything

other than the marijuana recently smoked by McFadden—noticed by customs officials

with presumably less-sophisticated noses and likely to have contaminated the

defendant currency.  *See id.* at 7.  Again, the government's argument leads to the

implausible—and troubling—conclusion that anyone who recently has used marijuana

could have one's cash seized as the suspected profits of narcotics trafficking.

---

[7] Some K-9s "alert . . . not to the presence of contamination . . . but rather to the odor of methyl benzoate, a chemical by-product of cocaine.  These more sophisticated dog alerts have been given greater weight because they indicate that the subject currency has been in recent contact with illegal drugs."  *United States v. $60,020.00 U.S. Currency*, 41 F. Supp. 3d 277, 288 (W.D.N.Y. 2011) (citing *Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d at 455, 459; *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001)).  That is not the case here, however.  The amended complaint does not allege that the K-9 used here was trained to alert to methyl benzoate; it instead alleges that the K-9 was trained to alert to "odors of marijuana, cocaine, heroin, ecstasy, methamphetamine[,] and their derivatives" and "indicated that controlled substances had been in recent contact with the [defendant] currency."  Docket Item 12 at 6-7.

In short, neither the marijuana smell nor the K-9 alert would support the government's theory that the defendant currency was substantially connected to narcotics trafficking.  That leaves the final allegation concerning the currency itself to carry the day.

The amended complaint states that the defendant currency consisted of 872 separate bills—539 of which were twenty-dollar bills.  *Id.* at 6.  It then asserts that "[b]ased upon [the] training and experience of law enforcement, the abundance of twenty-dollar bills is significant because small denominations (such as twenty-dollar bills) are more commonly used than other denominations in street level drug trafficking." *Id.* at 6 n.1.  But even if the government is correct and a person who sells drugs is more likely to possess lots of twenty-dollar bills, that does not mean the inverse is true.  In other words, simply because a drug seller likely has a large stack of twenty-dollar bills does not mean that any person who has a large stack of twenty-dollar bills likely sells drugs.  An individual might have many twenty-dollar bills for a variety of reasons, including, for instance, that he was paid in cash for a low-wage, off-the-books job, as McFadden claimed he was.  *See id.* at 4.

What is more, the assumption underlying the inference of criminality is that the only—or at least the most likely—reason an individual would not use a bank to store money is that the money is derived from criminal activity.  That assumption wholly ignores the fact that a significant number of Americans are unbanked, meaning that no one in their household has a checking or savings account.  *See, e.g.*, Fed. Deposit Ins. Corp., 2017 FDIC National Survey of Unbanked and Underbanked Households app. tbls., at 5 tbl. A.3 (2018), https://www.fdic.gov/analysis/household-

survey/2017/index.html (25.7% of Americans with income less than $15,000 are unbanked, compared to 6.5% of all Americans; 16.9% of Black Americans are unbanked, compared to 3.0% of white Americans). And even if not using a bank to hold one's money gives rise to a suspicion of criminality, there still would be no reason to link that criminality to narcotics.

As for the bundling of the bills, "[i]t seems perfectly reasonable that anyone who is in possession of a large sum of money, for whatever purpose, might separate that money into smaller and more easily manageable increments." *See U.S. Currency, $30,060.00*, 39 F.3d at 1044. Even if this Court might see the matter differently had McFadden carried, say, $242,484.00 in the form of "18,362 bills . . . weigh[ing] approximately forty-and-a-half pounds," *see United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) (affirming forfeiture order), that is not the case here. McFadden carried many fewer bills and much less cash.

Quite simply, in the absence of any other allegations that McFadden was trafficking narcotics, the large number of bundled bills fails even to suggest a "*substantial* connection between the property and the [alleged criminal] offense." *See* 18 U.S.C. § 983(c) (emphasis added); *cf. Mondragon,* 313 F.3d at 866 (denying claimant's motion to dismiss; although "[t]he presence of [nearly $500,000] cash, oddly packaged, . . . without more[,] . . . d[id] not suggest a connection to drug trafficking," additional allegations—including the money having been found "hidden in a professionally constructed secret compartment behind the back seat of [a] car" and a K-9 alert "not . . . directly on the sealed plastic bags of currency, but rather on the back seat area of the car," "supported a reasonable belief that drugs had been transported in

the car, probably in the secret compartment, and that the currency found in the compartment was linked to drug trafficking"); *United States v. $13,000 in United States Currency,* 733 F.2d 581, 585 (8th Cir. 1984) (affirming forfeiture order where the claimant was observed at an airport carrying a shoulder bag later discovered to contain $13,000 and "plastic bags, tape, and rubber bands"—"common materials used by narcotics violators"—and recently had placed a number of toll calls to a residence which he had frequently contacted prior to his earlier "arrest for conspiracy to distribute cocaine").

The Court concludes by observing what is conspicuously absent from the amended complaint:  allegations that McFadden ever was involved in any criminal activity *whatsoever*, let alone in *trafficking narcotics*.  The amended complaint "specifies no date or location of any purported or intended exchange, no dollar amount of such an exchange, no specific type or quantity of controlled substance, and no identified participant."  *See $39,000 in Canadian Currency*, 801 F.2d at 1220 (affirming dismissal of complaint for lack of particularity).  On the contrary, the amended complaint explicitly says that "McFadden was not arrested and does not have a prior criminal history."  Docket Item 12 at 5.  Nor did the government muster any additional evidence of drug trafficking in the eight months between seizing the defendant currency and amending its complaint.[8]  There also is no allegation that McFadden attempted to conceal the

---

[8] To the extent the government might have withheld certain allegations to protect a parallel criminal investigation, that strategic choice would not prevent dismissal of this civil action.  "To prevent the transfer of assets before a conviction is obtained, the . . . criminal forfeiture provisions of title 21 provide substantial means to freeze an individual's property upon or before the filing of an indictment."  *$39,000 in Canadian Currency*, 801 F.2d at 1218 (citing 21 U.S.C. § 853).  Those provisions include unique procedural requirements, not found in the civil forfeiture provisions, specifically aimed at

defendant currency while passing through the security checkpoint, which might at least have suggested guilt of something. *Cf. Mondragon*, 313 F.3d at 866. "These claims of unidentified parties and unspecified conduct neither give [McFadden] a reasonable starting point from which to initiate a meaningful investigation nor permit a responsive pleading that can address identities, quantities, locations, or dates of an alleged offense." *$39,000 in Canadian Currency*, 801 F.2d at 1220.

The Court acknowledges that "no complaint may be dismissed on the ground that the [g]overnment did not have adequate evidence at the time the complaint was filed." 18 U.S.C. § 983(a)(3)(D). But that caveat does not relieve the government of its fundamental burden whenever it seeks to strip a citizen of his property: to allege facts sufficient "to support a reasonable belief," Fed. R. Civ. P. Supp. R. G(2)(f), that it will be able to "establish, by a preponderance of the evidence, that . . . there was a substantial connection between the property and the offense," *id.* § 983(c)(1), (3)—here, narcotics trafficking. And even though "[f]ew courts have interpreted Supplemental Rule G(2)(f)," *see Aguilar*, 782 F.3d at 1108, this Court is not alone in dismissing complaints for civil forfeiture when the government fails to meet that burden. *See, e.g.*, *$39,000 in Canadian Currency*, 801 F.2d at 1220.[9] In reaching this conclusion, the Court echoes the sentiments expressed by the Eleventh Circuit more than three decades ago:

> We are not unsympathetic to the government's strong desire to eradicate
> drug trafficking:  we recognize that illegal drugs pose a tremendous threat

protecting against "the due process implications of pre-indictment restraints on assets." *Id.* at 1219. The government has chosen instead to proceed civilly against McFadden's assets and must meet the attendant burdens, including disclosure of the particular grounds upon which its claim for forfeiture rest.

[9] *See also United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538, 1548 (11th Cir. 1987) (finding that complaint failed to "allege sufficient facts to provide a reasonable belief that . . . the government ha[d] probable cause to believe that a

to the integrity of our system of government.  We must not forget, however, that at the core of this system lies the Constitution, with its guarantees of individuals' rights.  We cannot permit these rights to become fatalities of the government's war on drugs.

*$38,000.00 Dollars in U.S. Currency*, 816 F.2d at 1548-49.

\* \* \*

The Court would be remiss if it did not address the elephant in the room: The Court fears that a not-insignificant portion of the government's case rests, quite impermissibly, on racial stereotypes.  How else, the government implicitly asks, could a young Black man come by so much cash if not through selling drugs?  Certainly, the government implies, not through hard—albeit "off the books"—labor.[10]  Stated plainly, the Court will not license the government's weaponization of racialized tropes.  And stated in legal terms, the amended complaint fails to allege facts sufficient to create a reasonable belief that the defendant currency was more likely than not substantially connected to unlawful narcotics trafficking.

─────────────

substantial connection exist[ed] between the property to be forfeited and the exchange of a controlled substance" and dismissing complaint because "the only facts presented in the complaint [were] that the [Drug Enforcement Agency] seized [$38,000] from [a certain individual] in the Atlanta Airport on May 23, 1984"); *United States v. $59,074.00 in U.S. Currency*, 959 F. Supp. 243, 249 (D.N.J. 1997) (directing the government to amend its complaint because it "d[id] not allege with any particularity any predicate act or acts which violate the Controlled Substances Act" and "d[id] not clearly state which person or persons [were] believed to have engaged in predicate narcotics trafficking").

[10] The amended complaint suggests that McFadden's explanation was implausible on its face.  *See* Docket Item 12 at 4-5.  But at $16 an hour, McFadden could have earned $11,000 after 687.5 hours of work—roughly 13 hours per week over the course of a year.  The Court fails to see how McFadden's explanation is so improbable, particularly given his representation he lived with his grandmother and thus likely had minimal living expenses.

Nazier McFadden, a nineteen-year-old Black man, was stopped and questioned for entirely lawful activity: individuals flying domestically are neither limited in the amount of cash they may carry nor required to declare the value of such cash. *Cf.* 31 U.S.C. § 5316(a) (requiring that individuals *entering or exiting the United States* declare monetary instruments in excess of $10,000.  After that initial stop, law enforcement caused McFadden to miss a flight, deprived him of his property, and subjected him to lengthy legal proceedings.  They did all that on the tenuous theory that the property that McFadden otherwise lawfully carried was the proceeds of drug-related activity.

As discussed above, it is not implausible that the cash was the result of *some* criminal, or at least off-the-books, activity.  But why did law enforcement jump to the conclusion that the money came from *drugs*?  Why did they interfere in *this* young man's right to travel?  Would the outcome have been different if a nineteen-year-old white man had attempted to travel with $16,037 in his billfold?  Would that man even have been questioned?  In short, whether the product of implicit or explicit biases, the actions of law enforcement in this matter beg the question:  why Nazier McFadden?

**<u>CONCLUSION</u>**

For the reasons stated above, McFadden's motion to dismiss, Docket Item 11, is GRANTED; the amended complaint, Docket Item 12, is dismissed; and the Clerk of the Court shall close the file.


SO ORDERED.

Dated:          August 26, 2022
                Buffalo, New York


_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE